[Civ. No. 32313.   Second Dist., Div. Four.   Jan. 23, 1969.]

P. M. HAMILTON et al., Plaintiffs and Appellants, v. BOARD OF SUPERVISORS OF SANTA BARBARA COUNTY, Defendant and Respondent; ALLIED PROPERTIES, Real Party in Interest and Respondent.

Price, Postel & Parma, Robert M. Jones and James H. Hurley, Jr., for Plaintiffs and Appellants.

Robert K. Cutler and George P. Kading, County Counsel and Dana D. Smith, Assistant County Counsel, for Defendant and Respondent.

Goux & Romasanta, J. F. Goux, Kenneth R. Nuss and Thomas P. Anderle, for Real Party in Interest and Respondent.

KINGSLEY, J.—The real party in interest owns a tract of real property, located on Channel Drive in Montecito, Santa Barbara County, on which it has for many years operated a cottage-type hotel (The Santa Barbara Biltmore) as a "nonconforming" pre-zoning use and under a conditional use permit heretofore granted to it pursuant to section 9 of Santa Barbara Ordinance No. 453. In 1966, it applied to the Santa Barbara Planning Commission for a "variance" and a Conditional Use Permit, to enable it to construct an 88-foot addition to the hotel building. The staff of the commission recommended denial of the request and, after a series of public hearings, the commission, by a vote of seven to two, denied it. The applicant thereupon appealed to the board of supervisors and that body, after a public hearing and a view of the premises, granted the application. Petitioners then brought the instant action in superior court to have the order granting the application set aside.[1] The superior court denied the writ and the present appeal followed. We stayed the effectiveness of the order granting the application pending the determination of the appeal.

Petitioners urge various matters as grounds for a reversal. Summarized, we state them as follows: (1) that the evidence before the board did not sustain its findings; (2) that the board's findings do not sustain its order; (3) that the board committed prejudicial error in viewing the premises, after the hearings had been closed and in the presence of representatives of the applicant but not of the protesting property owners. Since we conclude that the findings made by the board, and on which its order rests, are insufficient to sustain the variance and permit, we need not consider the other two alleged errors. The sufficiency of evidence can be determined only in the light of findings purportedly based thereon. Unless and until proper findings are made by the board we cannot know what evidence it believed or relied on.

The provisions in zoning laws for variances, and for condi-

---

[1]Respondent, in its brief, and real party in interest at oral argument, now urge that petitioners are not shown on the record to be persons entitled to contest the order in issue. In paragraph I of the petition, it is alleged that each of the petitioners "has been and now is an owner of real property within the area" involved in the proceeding. That allegation was never denied by respondent; it was denied by the real party in interest only on information and belief. The matter was not otherwise raised in the trial court; the existence of such an issue was never called to that court's attention; the case was tried and decided strictly on its merits. It is too late to urge, in this court, for the first time, a technical issue which could easily have been resolved at the trial level.

tional use permits, are designed for a limited purpose. They exist because it is recognized that, within a ''zone,'' there will be individual lots or tracts that, because of peculiar shape, unusual topography, or some similar peculiarity, cannot be put to productive use if all of the detailed requirements for that zone are to be strictly applied. Hence administrative and quasi-judicial procedures are established, whereby the owner of such a piece of land may be allowed relatively minor variations from the strict letter of the law. Typical of such variations are those relating to setback lines, proportion of building size to lot area, and similar deviations. The concept is that the basic zoning provision is not being changed but that the owner of the individualized lot is allowed to use it, in a manner basically consistent with the established zone, but with such minor variations as will put him on a par with other property owners in the same zone whose lots conform in size, shape, topography, etc., to the overall pattern envisaged by the zoning ordinance. The procedures are created to bring the applicant to a substantial parity with other owners in the zone in devoting his property to the basic function of that zone; they are not created to give the applicant a better position than that enjoyed by his neighbors in the zone.[2]

Contrasted with the variance-conditional use procedures, is the legislative procedure involved in a change of zone. Such a change is, of course, a legislative matter, resting on whatever policy considerations the legislative body deems sufficient. It is important to remember that the case at bench does not involve an effort to ''rezone'' the Biltmore Hotel property. The property owner sought a variance and a conditional use permit; the board purported to give it what it asked; the

[2]In its recent report to the mayor and city council of Los Angeles, the Citizens Committee on Zoning Practices and Procedures, stated the rule in the following terms (at pp. 39-40): ''The sole legitimate purpose of variances is to modify the application of a zoning ordinance as it applies to a given piece of property to bring the privileges of that property to a parity with other properties similarly located and classified. . . . The variance device should never be used in the opposite direction to grant special privileges. By proper adjustment of equities, the use of the police power in the form of zoning is brought into conformity with constitutional limitations upon its use by assuring that it will deal similarly with all persons or properties under similar circumstances.

''Because zoning regulations for a given district must apply to parcels with differing sizes, shapes, topography and other characteristics, it is virtually impossible to write regulations that will apply equally to all situations in a specific zone. Thus, the variance was designed as a technique for maintaining equal treatment under circumstances which could not adequately be anticipated in advance in the adopted regulations.''

·board's order must be tested by the rules applicable to the order prayed for and purportedly granted.[3]

These concepts are summarized in section 65906 of the Government Code, concededly controlling here: "Variances from the terms of the zoning ordinance shall be granted only when, because of special circumstances applicable to the property, including size, shape, topography, location or surroundings, the strict application of the zoning ordinance deprives such property of privileges enjoyed by other property in the vicinity and under identical zoning classification.

"Any variance granted shall be subject to such conditions as will assure that the adjustment thereby authorized shall not constitute a grant of special privileges inconsistent with the limitations upon other properties in the vicinity and zone in which such property is situated."

If the property can be put to effective use, consistent with its existing zoning, without the deviation sought, it is not significant that the variances sought would make the applicant's property more valuable, or that they would enable him to recover a greater income, nor that they would relieve him from undesired costs in compliance with the existing restrictions. (*Broadway, Laguna etc. Assn.* v. *Board of Permit Appeals* (1967) 66 Cal.2d 767, 775 [59 Cal.Rptr. 146, 427 P.2d 810].)

With these concepts in mind, we turn to examine the "findings" on which the board's order rests. In that connection we note that the findings, and the considerations on which they rest, are stated in the record only as parts of the motion to grant the order in question. This is not a desirable pro-

---

[3]The real party in interest argues in its brief that it needs no variance to construct a building of the height desired. We do not pass on that issue. If the order herein sought is, in fact and in law, unnecessary, nothing in this opinion will affect the rights of the hotel. But the case was treated before the board of supervisors and was tried below on the theory that the real party in interest desired, for some reason, the order which it secured. We determine only the validity, on this record, of that order.

As we have indicated above, we recognize that the hotel, as it presently exists and is operated, deviates from the requirements of the zoning ordinance enacted after it was constructed. The validity of that situation is not challenged. But when a property owner seeks to go beyond uses already permitted to him by virtue of its pre-zoning construction or its earlier permit, it cannot claim such an extension except on the theory that it is, under its present set of rights, being treated less favorably than other properties in the zone which are legally conforming to the zone regulations. In other words, the hotel cannot claim that, because it presently has a position more favorable than the zoning law would otherwise allow, it has a right to increase that disparity.

cedure, but, for the purpose of this appeal, we accept the language of the motion, adopted by the board, as being the formal findings required by law.

Technically the "findings" are two in number, contained in the following language:

"I further move that we adopt the following two findings of ultimate fact as prescribed in Section 65906 of the Government Code: 1) There are special circumstances applicable to the applicant's property which I have just recited; there are no other properties in the immediate vicinity which are zoned exactly the same as the Biltmore Hotel (6-R-2) which have a conditional use permit to operate as a hotel; 2) Because of such special circumstances, the strict application of the zoning ordinance deprives the property of privileges enjoyed by other property in the vicinity and under identical zoning classification,"

But these "findings" have meaning only as we examine the "special circumstances" recited in an earlier part of the motion and incorporated into the "findings" by reference.[4] Those circumstances were stated as follows:

"1. The Biltmore Hotel was originally constructed in 1927 before any zoning ordinance regulated the use of the Biltmore property.

"2. Subsequent to the adoption of Ordinance 453, the Biltmore Resort-Hotel has been permitted to expand from time to time.

"3. There is no other single parcel of property in the immediate area on Channel Drive under the same or other zoning of a size as large as the approximately 21 acres of the Biltmore property.

"4. The Biltmore Hotel gardens, grounds and open spaces constitute a major contribution to the beauty of Channel Drive upon which the Biltmore faces. Channel Drive is one of great scenic beauty which attracts many tourists. Tourism is the major economic welfare of the community. Channel Drive does not run past, into or through the Miramar Hotel. The Biltmore Hotel property is the only 6-R-2 property fronting on Channel Drive. All other properties are zoned 20-R-1.

"5. To add a number of cottages to the Biltmore to obtain a density closer to that enjoyed by the Miramar Hotel would create a tract-like development and would have a detrimental effect upon the character and beauty of Channel Drive.

---

[4]Compare *Robison* v. *City of Oakland* (1968) 268 Cal.App.2d 269 [74 Cal.Rptr. 17].

"6. There are many eucalyptus trees of a height of 100 feet or more abutting the site of the proposed building and along the westerly boundaries of the property.

"7. Structures on the Biltmore property already extend to a height of 70 feet.

"8. No other single parcel of property in the immediate vicinity is the size of the Biltmore's property, or of a size, shape and topography to support a development duplicating that of the Biltmore.

"9. The proposed building, because of dense vegetation, trees, buildings, topography, distance and location will not have any appreciable effect whatsoever upon the views of occupants of other property in the vicinity.

"10. The location of the proposed structure places it from 440 feet to 700 feet from and northwesterly of Channel Drive and Olive Mill Road. The uniquely large size of the Biltmore property, therefore, permits the choice of a location much further removed from surrounding thoroughfares and properties than what could be provided on smaller properties which represent the general property size pattern for the area.

"11. The Biltmore property and the Channel Drive area are effectively insulated and isolated from the rest of Montecito by the City of Santa Barbara, the commercial strip along Old Coast Highway, the very wide right-of-way of U.S. Highway 101, and the Southern Pacific Railroad right-of-way all to the north; the Bonneymede property and Olive Mill Road to the east; the Pacific Ocean to the south and ridges, dense trees and vegetation to the West. No other area in Montecito is so situated.

"12. The Biltmore is an undoubted asset to the community. In light of the circumstances applicable to the Biltmore, to freeze or restrict its expansion to more little cottages might be advantageous to others but it would cause a special deprivation to the Biltmore, would ultimately be to the detriment of the area, would require otherwise avoidable and unnecessary demolishing of valuable grounds and open spaces, would promote inefficiency and economic waste in the proper utilization of this unique property and would work unnecessary destruction of scenic values."

Clearly, none of these circumstances, nor all of them taken together, meet the legal requirement.[5] They incorporate the

[5]We recognize that the cases heretofore cited involved city charters containing language dealing more specifically with the form of findings

same reliance on a ''profit motive,'' ''attractive architectural features,'' ''benefit to the community'' and ''practical difficulty'' that were urged on the Supreme Court in the *Broadway, Laguna* case, above cited, and there expressly held to ''lack legal relevance.'' The language of the court in that case is equally applicable here: ''The variance sought by the developer in this case would confer not parity but privilege; to sanction such special treatment would seriously undermine present efforts to combat urban blight and municipal congestion through comprehensive zoning codes. So selective an application of the provisions of the City Planning Code would destroy the uniformity of the zoning laws which is their essence.'' (66 Cal.2d 767, at p. 781.)

The judgment denying the writ of mandate is reversed.

Files, P. J., and Dunn, J., concurred.

Petitions for a rehearing were denied February 14, 1969, and the opinion was modified to read as printed above. The petition of all the respondents for a hearing by the Supreme Court was denied March 19, 1969.

---

than does section 65906 of the Government Code. However where, as here, the board has proceeded to make specific findings and those findings disclose a reliance solely on immaterial matters and omit any reference to any material matter, the resulting order must be judged on the action taken, not on some other action which the board did not take.